UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    *Plaintiff*,<br>v.<br>KARL ROYE,<br>    *Defendant*. | Civil No. 3:15cr29 (JBA)<br><br>August 25, 2017 |

## RULING ON DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AND FOR NEW TRIAL

On August 4, 2016, after a jury trial, Defendant Karl Roye was found guilty of conspiracy to commit a Violent Crime in Aid of Racketeering ("VCAR") Murder in violation of 18 U.S.C. § 1959(a)(5) (Count One) and VCAR Murder in violation of 18 U.S.C. §§ 1959(a)(1) and (2) (Count Two). Defendant now moves [Doc. # 199] for judgment of acquittal pursuant to Fed. R. Civ. P. 29, or alternatively for a new trial pursuant to Fed. R. Civ. P. 33. The Government opposes [Doc. #216] Defendant's Motion. Oral argument was held on May 12, 2017. For the reasons that follow, Defendant's Motion is granted in part and denied in part.

### I. Discussion

On April 6, 2011 Anthony Parker (aka "Smooth") was murdered after being shot multiple times while sitting in his vehicle parked at 15 Thomaston Street in Hartford, Connecticut. (Tr. at 53:6-8; 53:23-25.) At Mr. Roye's trial for Parker's murder there was testimony that Defendant and

his co-defendant, Jimel Frank,[1] two members of an organization called Wall Street,[2] a "geographically-based drug trafficking street gang located in the Blue Hills Section of Hartford" (*id.* at 85-88) committed the murder in response to several incidents they believed Parker, who was a member of another group called "Ave" (tr. at 116:15-21), to have been involved in. Additional relevant facts are incorporated into the Court's analysis of whether the record supports Defendant's arguments.

Defendant argues his acquittal is warranted because the Government failed to prove he had the requisite motive to murder under Section 1959, and with respect to the conspiracy charge, that there was no evidence of his having made any agreement to murder. In the alternative, Defendant contends that he is entitled to a new trial because he was denied a fair trial because of the allegedly prejudicial admission of evidence of a prior search of his residence and the Government's failure to correct alleged perjured testimony of prosecution witness Anthony Owens.

**A. Legal Standards**

*1. Rule 29*

Under Fed. R. Crim. P. 29(a) "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." "A Rule 29 motion [for a judgment of acquittal] should be granted only if the district court concludes there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable

---

[1] Mr. Frank pled guilty on November 12, 2015 to Count Two of the Indictment charging him with VCAR Murder in violation of 18 U.S.C. § 1959(a)(1). (*See* Plea Agreement [Doc. # 84] at 1.) He testified for the Government at trial.

[2] The group was first referred to as "Wall Street," which then morphed into "Team Grease." (Tr. at 18-21.) For simplicity purposes only, the Court refers to the enterprise as "Wall Street."

doubt." *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006) (internal quotations omitted). The Court must view the evidence presented at trial in the light most favorable to the Government, and draw all reasonable inferences in its favor. *United States v. Cote*, 544 F.3d 88, 98 (2d Cir. 2008). "[I]t is well settled that 'Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'" *Id.* at 99 (quoting *United States v. Guandagna*, 183 F.3d 122, 129 (2d Cir. 1999)). "The Court must give full play to the right of the jury to determine credibility." *Id.* "A defendant challenging the sufficiency of the evidence that was the basis of his conviction at trial bears a heavy burden." *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) (internal quotations and citations omitted).

In short, the Court may not disturb a conviction on grounds of legal insufficiency absent a showing that "no rational trier of fact could have found each essential element of the crime beyond a reasonable doubt." *United States v. Walsh*, 194 F.3d 37, 51 (2d Cir. 1999).

### 2. Rule 33

Alternatively, a new trial may be granted pursuant to Fed. R. Crim. P. 33 "if the interest of justice so requires," particularly where there is "a real concern that an innocent person may have been convicted." *United States v. Canova*, 412 F.3d 331, 344, 349 (2d Cir. 2005) (quoting Fed. R. Crim. P. 33(a)). "In the exercise of its discretion, the court may weigh the evidence and credibility of witnesses," *United States v. Cote*, 544 F.3d 88, 101 (2d Cir. 2008), but "[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment," *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). While courts have broader discretion to grant a new trial under Rule 33 than to grant an acquittal under Rule 29, "courts must nonetheless exercise Rule 33 authority sparingly and in the most

extraordinary of circumstances." *Id.* "The test is whether it would be a manifest injustice to let the guilty verdict stand." *Sanchez*, 969 F.2d at 1414.

### B. Defendant's Rule 29 Arguments

#### 1. There is Sufficient Evidence of Defendant's Motivation to Support his Conviction

Defendant claims the Court must "set aside the verdict and enter judgment of not guilty," arguing that "[t]he Government failed to present any evidence showing Roye's motive for being involved [in the murder]," (Def.'s Mot. for Acquittal [Doc. # 199] at 12-13) and that the Government's Opposition improperly insinuates that evidence of gang membership serves as a "stand-in" for Defendant's motivation (Def.'s Reply at 3). In opposition, the Government contends that considering all of the facts and circumstances in the evidentiary record in favor of the Government as the Court must, the evidence it introduced at trial was sufficient for the jury to find Defendant was motivated by his desire to maintain his position in the enterprise. (*See* Gov't Opp'n at 20-23.)

##### a. The Law

The VCAR statute provides in pertinent part as follows:

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders . . . any individual in violation of the laws of any State or the United States . . . shall be punished—(1) . . . by death or life imprisonment, or a fine under this title, or both.

18 U.S.C. § 1959(a). In light of this language, the Second Circuit has concluded that Section 1959 "contains a motive requirement." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). Thus, in order for the Government to prove both Counts One and Two it must prove as an element of

4

the charged crimes that "at least one of the Defendant's purposes in [conspiring to murder and] committing the murder was to maintain or increase his position in the racketeering enterprise." (Jury Instructions [Doc. # 191] at 17.)[3]

According to the Second Circuit, "[t]he government satisfies the motive requirement if 'the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.'" *Ferguson*, 246 F.3d at 134 (quoting *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992)). This need not have been his only purpose or even primary purpose, as long as the murder was committed "as an integral aspect of membership in the enterprise." *Id.*

A Section 1959 conviction must be affirmed if the defendant's "motivation to maintain or increase his position may be reasonably inferred from the evidence," but affirmance is not warranted where "that inference is based on no more than guesswork." *United States v. Thai*, 29 F.3d 785, 819 (2d Cir. 1994). Both the Ninth and Sixth Circuits have refused to recognize any presumption that gang members who commit violent acts always do so with the purpose of maintaining their status within the gang. *United States v. Banks*, 514 F.3d 959, 968 (9th Cir. 2008); *United States v. Hackett*, 762 F.3d 493, 500 (6th Cir. 2014). As the Sixth Circuit pointed out, to find otherwise, "in gang cases, the purpose element would be nearly a tautology." *Hackett*, 762 F.3d at 500. Indeed, a district court in Connecticut (Nevas, J.) found that

> The government's argument that any personal act of disrespect toward [the defendant] was tantamount to an act of disrespect against the Enterprise blurs *Concepcion's* distinction between violent crimes that are committed in connection

---

[3] The Government did not pursue the theory that Defendant committed the murder for "anything of pecuniary value." 18 U.S.C. § 1959(a).

with a criminal enterprise's affairs and those that arise from purely non-enterprise-related matters. Indeed, taking the government's theory to its logical conclusion, any act of violence committed by a member of a drug-trafficking group, whether related to its drug-trafficking objectives or not, would be a VICAR offense.

*United States v. Jones*, 291 F. Supp. 2d 78, 89 (D. Conn. 2003).

Still, because the jury "cannot look into [Defendant's] mind, [it] may attempt to determine his purpose by considering all of the facts and circumstances . . ." (Jury Instructions [Doc. # 191] at 17.) The court in *Ferguson* discussed several cases involving "circumstances in which a defendant who is an established member of a criminal enterprise acts in a way consistent with that membership" and thereby was found to have the required motive. 246 F.3d at 135 (citing *Concepcion*, 983 F.2d at 382–83 (defendant was a lieutenant in the enterprise and initiated violence in connection with its narcotics business to maintain and increase his leadership position in the group); *United States v. Diaz*, 176 F.3d 52, 94–95 (2d Cir. 1999) (defendants were gang members who furthered that membership by killing an informant who could harm the gang's narcotics enterprise)).

In *United States v. Burden*, the Second Circuit found "[t]he jury could easily infer from the evidence of the activities that took place . . . and the people involved that the acts of violence were part and parcel of the culture of the Organization, just as [was] participation in the drug business." 600 F.3d 204, 221 (2d Cir. 2010). The *Burden* court explained that the evidence from which the jury could infer the defendants' motives included testimony from one member of the enterprise "that threats and acts of violence, along with a general reputation for violence, were essential to one's success and enhanced a member's standing in the . . . Organization," and describing "an overall climate of violence as [being] integral to a member's success in the Organization." *Burden*, 600 F.3d at 220. There was also evidence that the head of the Organization had instructed members

6

that the victim needed to be "dealt with sooner or later" and praised the defendant after he shot the victim. *See id.*

Thus, while mere membership in a gang cannot alone provide a basis for establishing a defendant's motivation to maintain his or her position in a gang, evidence of membership in addition to other evidence connecting the crime to the gang's activities, whether direct or circumstantial, could suffice for a jury to infer the requisite motivation.

> b. *Viewed in the Light Most Favorable to the Government, the Jury's Finding is Supported by the Record*

The Government argues that from the evidence offered at trial "the jury could readily have concluded . . . that the murder of Anthony Parker, a person who posed a threat to the drug operation and members of the enterprise, was an act that was expected of [Defendant] and that allowed [him] to maintain [his] position[] within the organization." (Gov't Opp'n at 22.) Drawing all permissible inferences in the Government's favor, the testimony at trial, as discussed below, established: (1) that the members of Wall Street, including Defendant, believed Parker was involved in a break-in to a car parked at Defendant's 225 Holcomb Street residence and in putting a gun to the head of another Wall Street member's mother, (2) that Wall Street responded to threats with violence, and (3) that the reason Defendant became involved in this murder was because Frank called him and asked him for assistance.[4]

There were two separate incidents which occurred prior to the murder on April 6, 2011 which the jury could reasonably interpret as leading the Wall Street members to perceive Parker

---

[4] Defendant's Motion does not dispute that there was ample evidence for the jury to find he was a member of Wall Street/Team Grease or that Wall Street/Team Grease qualifies as a RICO enterprise.

7

as a threat. First, not long before the murder, someone had broken into a car parked outside Roye's residence, causing some damage to the vehicle, and either stole drugs hidden inside or attempted to do so. (Tr. at 969-70.) Ricardo Howe testified that Defendant and Frank told him about the attempted theft and their belief that Parker's "people" were responsible for the incident. (Tr. at 931:22-933:18.) Anthony Owens corroborated this incident, testifying that he had related to Frank that Parker had admitted that he had stolen a half a brick (500 grams) of cocaine at the Holcomb Street address. (Tr. at 701-02.)

The second incident for which Roye and Frank believed Anthony Parker was responsible concerned an individual putting a gun to the head of Wall Street member Kendall Brown's mother. Frank testified that Anthony Owens informed him that Anthony Parker was responsible for that incident and that he in turn told his fellow Wall Street members Kendall Brown and Karl Roye what he had learned from Owens. (Tr. at 972.) The testimony also reflected that Frank, who at the time was involved in the distribution of cocaine, drove a car which was very similar in appearance to that driven by Brown's mother and Frank believed that he himself was the intended victim of the gun incident. (*Id.* at 973-74.) Furthermore, Howe testified that both Defendant and Kendall Brown had told him about the incident and that it was Anthony Parker's "people" who were responsible. (*Id.* at 934:16-20.) Additionally, Frank testified to feeling "disrespected" after this incident and to the following discussion he had with Defendant:

> Q. Tell the jury what the discussion was involving you, Kendall Brown, and Karl Roye, what did you -- what was the discussion; what did you say, what was decided?
> A. Oh, that this dude is tripping, and we need to see him for that.
> Q. I'm sorry, you had to what?
> A. We had to -- we had to take care of him, pretty much.
> Q. You had to take care of Smooth?
> A. Yeah, we was going to attempt to rob him as well, since that's what he was trying to do.

(Tr. at 975:9-20.)

Additionally, testimony from several witnesses implied that violence could be expected in order to protect the organization and its members. For instance, Sergeant O'Hare testified in response to the Government's leading questions, in reference to Wall Street and another group, as follows:

> Q. And these gangs, I think as I take it, use violence to protect their areas, right?
> A. Sometimes, yes, sir.
> Q. And it's probably best that a member of one gang not leave their geographic area and go into the geographic area of another; in an ordinary course, there may be an instance where they do or need to, but probably best not to?
> A. Yes, sir.
> Q. As you said yourself, these gangs sort of fiercely protect their own territory?
> A. Yes, sir.

(Tr. at 119:8-19.) Additionally, Ricardo Howe agreed "somebody pulling a gun on the head of the mother of one of the members of [the] group, is . . . a serious offense" that would not be ignored. (Tr. at 935:22-936:3.) Anthony Owens, who himself sold drugs in an area outside of the Blue Hills section of the city, testified to the jury that any non-Wall Street person who tried to deal drugs on Wall Street turf would "be dealt with." (Tr. at 695-96; *id* at 848-49.) Moreover, Frank himself confirmed portions of his November 12, 2015 plea colloquy in which he stated that he was a member of Wall Street (*id.* at 1017:23-1018:2)[5] and that members and associates of Wall Street used force and violence to protect and control their territory (*id.* at 1019:7-14).

Finally, the evidence established that Defendant only became involved in Parker's punishment on the day of the murder at the behest of Frank. On the morning of April 6, 2011,

---

[5] Frank always disputed that he was the leader of Wall Street. (*See id.* at 1018:23-1019:7 (stating that "[i]t was just a group of friends, it wasn't really no leader.").)

9

Frank learned from Owens that Parker was in the Wall Street controlled area. (*Id.* at 977.) Upon learning this information, he made several calls to Kendall Brown, but when those calls went unanswered, he called Defendant, who answered the call. (*Id.* at 978:6-9.) Frank informed Roye of what Owens had told him about Parker's location in Hartford and "gave him the rundown," testifying that he had told Roy he was "about to come to Hartford, and [Parker] was going to be with Anthony Owens, so it's our time." (*Id.* at 978:13-21.) He further testified that when he saw Parker he was going to rob him, as Parker had robbed him.[6] (*Id.* at 978:22-979:5.) Frank then drove, in his black Yukon SUV, to Roye's home where he picked him up. (*Id.* at 980.) When Roye came out of 225 Holcomb Street, he had two handguns and latex gloves with him. (*Id.* at 981.)

Frank and Roye drove over to where Frank had learned from Owens that he and Parker were located on Thomaston Street. (*Id.* at 985, 998.) Once Frank and Defendant located the Parker vehicle, Frank walked up to the driver's side of the vehicle and Roye the passenger side. (*Id.* at 985.) When Parker told Frank he was going to kill him, Frank and Defendant began shooting into the car. (*Id.* at 986; 1031.) After both men fired multiple shots into the car, they returned to the SUV and drove away from the scene. (Tr. at 777:14-19.)

The jury was entitled to credit this evidence and conclude that Defendant perceived Parker to be a threat to the enterprise and its members, and that Defendant's actions were in accordance with the expectations of the gang and were done with the intention of meeting his obligations as a member. Therefore, there was sufficient evidence for the jury to "properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership

---

[6] It is unclear from Frank's testimony whether when he gave Roye "the rundown" this included informing him of his express intent to rob Parker.

10

in the enterprise or that he committed it in furtherance of that membership.'" *Ferguson*, 246 F.3d at 134 (quoting *Concepcion*, 983 F.2d at 381). Therefore the jury's verdict is supported by the evidence and Defendant's Motion for acquittal of the VCAR murder conviction is denied.[7]

### 2. The Evidence was Insufficient to Support the Jury's Conspiracy Verdict

The Court instructed the jury with regard to the conspiracy count as follows:

What the Government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other to commit the unlawful act charged in the Indictment.

You may, of course, find that the existence of an agreement to disobey or disregard the law has been established by direct proof. However, since conspiracy is, by its very nature, characterized by secrecy, you may also infer its existence from all the circumstances and the conduct of the parties involved because actions often speak louder than words.

---

[7] Defendant's Reply argues:

. . . there was no evidence offered by the Government at all about what Roye's motives were. No witness testified to statements or actions that Roye allegedly made that could be reasonably inferred to show his motivation, let alone intent. There were no wiretaps or electronic evidence supporting the Government's inflammatory theory of motive. None of the witnesses with personal knowledge testified to either an opinion or fact supporting the Government's contention.

(Def.'s Reply at 2-3.) However, as the Court instructed the jury, it was permissible for the jury to infer motivation based upon consideration of all of the facts and circumstances. Thus, the lack of direct evidence, as articulated by Defendant, does not preclude a finding of motivation. (Jury Instructions at 17.)

(Jury Instruction at 19.)[8] Defendant argues there is not sufficient evidence to convict on the conspiracy charge because there was no evidence of any agreement to commit the unlawful act charged in the indictment, i.e., murder Parker, but only to rob him.

The only testimony relating to any verbal agreement was the testimony of Frank:

> Q. Tell the jury what the discussion was involving you, Kendall Brown, and Karl Roye, what did you -- what was the discussion; what did you say, what was decided?
> A. Oh, that this dude is tripping, and we need to see him for that.
> Q. I'm sorry, you had to what?
> A. We had to -- we had to take care of him, pretty much.
> Q. You had to take care of Smooth?
> A. Yeah, we was going to attempt to rob him as well, since that's what he was trying to do.

(Tr. at 975:9-20.) The Government argues that this statement, emphasizing the phrase "take care of him," can reasonably be interpreted as a plan to murder Parker "as well" as rob him. (*Id.*) Defendant contends the testimony clearly demonstrates that they intended to do what Parker had done to them — as in rob him — and that it says nothing of murder. Because Frank's testimony never mentions killing Parker and "take care of him" includes a multitude of forms of retribution, no rational jury could conclude beyond a reasonable doubt that this conversation amounted to a verbal agreement to murder Parker, particularly where Frank confirmed the plan was to rob Parker:

> Q. [E]xplain to the jurors what happened then. You called the defendant, and then what happened?
> A. I pretty much told him that Anthony Owens told me that Mr. Parker was coming to pick him up, and I just gave him the rundown.
> Q. And when you say you gave him the rundown, what does that mean? Just explain that to the jury?

---

[8] There was no objection to the law as instructed in the charge.

> A. That means I told him that I'm about to come to Hartford, and he was going to be with Anthony Owens, so it's our time.
> Q. And what was it that you attempted to do at that time?
> A. Well, what, when I seen Parker?
> Q. Right, when you saw --
> A. I was going to rob him.
> Q. -- Mr. Parker, what did you intend to do?
> A. I was going to rob him.
> Q. Just like he had tried to rob you?
> A. Correct.

(Tr. at 978:10-979:5.)

Even without an actual verbal agreement to murder Parker, the Government claims there is sufficient evidence to support the conspiracy conviction in light of the totality of the evidence, including the fact that earlier on the morning of the Parker murder, Frank had called Owens and told him that he (Frank) intended to go across the street to Owens's mother's house where Anthony Parker was outside sitting in a car and "shoot the car up." (Tr. at 719:24-720:5.) The Government further points to the evidence that when Frank picked Defendant up from his home, Defendant brought with him the guns and gloves (tr. at 982:12-22), and that no robbery of Parker ever took place. Rather, Frank and Roye walked up on opposite sides of the vehicle in which Parker was seated and Parker threatened to kill Frank, at which point both Frank and Roye opened fire on Parker. (Tr. at 985:13-986:14.)

This discussion between Frank and Owens that Frank was going to shoot up Parker's car in front of Owens' mother's house is not persuasive evidence of an agreement between Frank and Defendant, who did not take part in that conversation, and where there was no evidence he had any knowledge of it. At most, this demonstrates that Frank himself may have intended to shoot Parker. Moreover, it is notable that the Government did not ask Frank what he meant by saying that they were going to "take care of him," and specifically did not ask whether that meant Frank

13

and Roye intended to kill Parker in addition to robbing him. Instead, the Government relies on the fact that Defendant was prepared with guns and gloves upon being called by Frank and that ultimately Parker was murdered but never robbed. However, the use of guns and gloves is also consistent with the stated plan to rob, and there was no other evidence that Roye and Frank agreed or planned to specifically murder Parker either during the telephone conversation, their car ride to Thomaston Street, or at any other point.

Even taking all inferences in the Government's favor and considering the evidence as a whole, there was no elaboration on what actually was contemplated by "we need to see him" or "take care of him pretty much" or "it's our time," and Frank unequivocally stated that they intended to rob Parker. Thus, the jury did not have evidence from which they could have reasonably concluded that Frank and Roye had an agreement of any sort to murder Parker. The Court is convinced that no "rational trier of fact could have found beyond a reasonable doubt" on this record that the Government proved an agreement to murder Parker before Frank and Roye did so. *See Walsh*, 194 F.3d at 51. Accordingly, the Court grants Defendant's Motion for Judgment of Acquittal on the conspiracy charge in Count One.

### C. Defendant's Rule 33 Arguments

#### 1. The Admission of Evidence of the Search of Defendant's Home

Defendant argues that he is entitled to a new trial because the Court improperly permitted evidence of an unrelated search more than a year before the crime at issue. At trial, the Court admitted evidence concerning an October 8, 2009, search of Defendant's residence at 225 Holcomb

Street. (Tr. at 3:13-4:13.)[9] The testimony established that prior to October 8, 2009, Hartford authorities were aware of the existence of the Wall Street gang (*id.* at 88:17-89:11; 99:23-100:2), that during that search a number of firearms were seized, as were crack cocaine and marijuana (*id.* at 111:15-112:1), and that the searchers found writing on the basement walls (graffiti) about "Wall Street" and "Wall Street Finest" (*id.* at 113:10-25). Defendant complains that the evidence was extremely prejudicial because he was never convicted of anything relating to the guns or crack cocaine, but only for charges relating to the marijuana. (*See id.* at 5:11-13.)

The Court permitted the evidence as relevant to proving the existence of the enterprise alleged in the indictment and the racketeering activity charged. (*Id.* at 4, 5-6, 105-06.) Immediately after this testimony was received, the Court gave a limiting instruction to the jury concerning what use could be made of the evidence, that is, the testimony could only be considered in connection as part of the government's proof of the existence of a racketeering enterprise and the alleged racketeering activity involving narcotics trafficking.[10] (*Id.* at 112:10-22.)

---

[9] The Court required that the Government first establish that Wall Street or Team Grease was in existence in some form, with Defendant's involvement, at the time of the 2009 search and arrest. (Tr. at 4:9-15.)

[10] The Court instructed:

The evidence that you have heard about the seized items is for a limited purpose. It's . . . part of the government's proof of existence of a racketeering enterprise as claimed in the indictment; namely, narcotics trafficking and acts of violence. And the government's claim is that it shows Mr. Roye's involvement in it. It is not, however, any evidence of Mr. Roye's involvement in the murder some years later, nor any propensity or character for engaging in criminal activity, okay? So that's the limiting instruction.

(Tr. at 112:10-22.)

Defendant contends this evidence should have been precluded pursuant to Rule 403's balancing test because it was of only minimal probative value given its cumulative nature, and was overwhelmingly prejudicial. (Def.'s Mot. for Acquittal at 19.) The Government responds that the evidence to which Defendant objects tends to prove an element of the respective offenses, which it was required to prove beyond a reasonable doubt, namely that an essential element of each crime charged was the existence of an enterprise. (Gov't Opp'n at 28.) The Government accordingly argues that "the evidence was highly relevant and probative because it was intrinsic to the crimes charged." (*Id.*)

The Government tethers its argument to the Second Circuit's opinion in *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008), a RICO conspiracy case involving a street gang, in which the defendant appealed the admission of prior uncharged drug trafficking activities and an uncharged shooting. While the defendant in *Mejia* argued that admission of these uncharged acts were improper under Fed. R. Evid. 404(b) whereas Roye advances an argument under Fed. R. Evid. 403's balancing test, it is noteworthy that the Second Circuit summarily rejected Mejia's position in holding that, "MS-13's involvement in narcotics trafficking was an element of the charged offenses, and as a result, evidence of narcotics trafficking is . . . direct evidence of the charged offense." *Id.* at 206. With respect to an uncharged shooting incident, the Court found no error, holding that "[t]he district court admitted the evidence to show the existence of the racketeering enterprise, and it expressly instructed the jury as to the limited use it could make of that evidence." *Id.* This is precisely the circumstances in which the Court permitted testimony regarding the October 8, 2009 search.[11]

---

[11] The *Mejia* court reasoned that:

This evidence was properly admitted in that it was directly relevant to proving the existence of the charged enterprise and Defendant's membership in the enterprise. Further, it was cabined by an appropriate and timely limiting instruction to the jurors. Accordingly, the Court denies Defendant's Motion insofar as he requests a new trial on the basis of the admission of evidence of the 2009 search.

### 2. The Allegedly Perjured Testimony

Defendant also argues the judgment should be set aside and a new trial ordered because the Government failed to correct perjured testimony by its witness, Anthony Owens. (Def.'s Mot. for Acquittal at 19.) The Government counters that the evidence does not support Defendant's assertion that Owens perjured himself, either in his trial testimony, or during his guilty plea allocution before the Court, and to the extent there was an "inconsistency" in what Owens stated, argues it was fully exploited by the defense before the jury. (Gov't Opp'n at 29.)[12]

Perjury is criminalized by 18 U.S.C. § 1621, which reads in pertinent part:

> Whoever . . . having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly . . . willfully and

---

> Although Appellants are correct in noting that evidence of a prior shooting presents a significant risk of prejudice, [w]hen a defendant engages in a criminal enterprise which involves very serious crimes, there is a likelihood that evidence proving the existence of the enterprise through its acts will involve a considerable degree of prejudice. Nonetheless, the evidence may be of important probative value in proving the enterprise.

United States v. Mejia, 545 F.3d 179, 206–07 (2d Cir. 2008) (internal citations and quotation marks omitted) (alteration in original).

[12] The Court does not agree with the Government's argument that there was no inconsistency in Owens' statements but agrees that the issue of Owens' dissembling was squarely before the jury at the time of its deliberations.

17

> contrary to such oath states or subscribes any *material matter* which he does not believe to be true . . . is guilty of perjury.

18 U.S.C. § 1621 (emphasis added). While under oath at his plea allocution, Owens said that he was in Parker's car prior to the shooting when he received a telephone call from Frank telling him to get out of the car. However, at trial he told the jury that he had already gotten out of Parker's car to urinate and while doing so he then received the call from Frank telling him to get out of the car. (Tr. at 724.) The Government did not correct this contradictory testimony but during cross-examination Defendant's counsel impeached Owens using the inconsistent statements, reading to the jury the relevant portion of the transcript from Owens' plea colloquy. (Tr. at 822.)

Defendant, noting how critical Owens' credibility was to the Government's case, argues that "[t]he jury – and Roye – did not get the benefit of seeing the prosecutor take its own witness to task. Not only is that the legal obligation lawyers have, it would have been of tremendous practical and theatrical effect." (Def.'s Mot. for Acquittal at 22.) Despite potential theatrical differences in how Owens' dissembling was presented, his contradictory versions of events were unequivocally presented for the jurors to consider when weighing his credibility.

Even if Owens' testimony about where he was when he received Frank's call was material enough to qualify as perjury, the testimony must still be sufficiently material to the jury's verdict to mandate a new trial. *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991). There are two tests to make this determination. *See id.* The first test applies only when the prosecution is reasonably unaware of false witness testimony. *Id.* Under such circumstances, a new trial is warranted if knowledge of the perjury leaves "the court with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Id.* The second test applies when the prosecutor knew or should have known of the perjury. *Id.* In that case, a conviction must

be set aside if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.*; *United States v. Wong*, 78 F.3d 73, 81 (2d Cir. 1996).

Because the same Government attorney was present at Owens' plea allocution and at Defendant's trial, he knew or should have been aware of the inconsistent testimony. Nonetheless, there is no "reasonable likelihood" that the jury's judgment was affected by Owens' possibly perjured testimony where Defendant's counsel brought out the inconsistent statements on cross-examination and vigorously attacked Owens' credibility in his closing argument. *See Wallach*, 935 F.2d at 456. The jurors had this information in front of them when they made their decision and the fact that it was Defendant and not the Government who impeached Owens does not alter the reality that the jury was fully aware of Owens' credibility issues.

The Government's failure to correct Owens' testimony did not create a manifest injustice and accordingly Defendant's Motion for a new trial based upon Owens' alleged perjury is denied. *See Sanchez*, 969 F.2d at 1414.

## II. Conclusion

For the foregoing reasons, Defendant's Motion for Judgment of Acquittal and for new Trial is GRANTED in part AND DENIED in part. Defendant's Motion is granted and judgment of acquittal is entered on Count One for conspiracy to commit a Violent Crime in Aid of Racketeering ("VCAR" Murder) in violation of 18 U.S.C. § 1959(a)(5). Defendant's Motion is denied in all other respects.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.
Dated at New Haven, Connecticut this 25 day of August 2017.